Filed 4/7/15  P. v. McLaurin, Lewis and Jordan CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>ANTHONY D. McLAURIN, DEVIN L. LEWIS and PAUL JORDAN,<br><br>  Defendants and Appellants. | B250278<br><br>(Los Angeles County<br>Super. Ct. No. TA125019) |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Arthur Lew, Judge.  Affirmed as modified.

Richard D. Miggins for Defendant and Appellant Anthony D. McLaurin.

Marcia C. Levine for Defendant and Appellant Devin L. Lewis.

Joanna McKim for Defendant and Appellant Paul Jordan.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Steven D. Matthews and Rama R. Maline, Deputy Attorneys General for Plaintiff and Respondent.

_____

Appellants Anthony McLaurin, Devin Lewis and Paul Jordan were each convicted, following a jury trial, of two counts of murder in violation of Penal Code[1] section 187, subdivision (a), one count of attempted murder in violation of sections 664 and 187, five counts of second degree robbery in violation of section 211, and one count of assault with a firearm in violation of section 245, subdivision (a)(2). Appellants Lewis and Jordan were also convicted of one count of being a felon in possession of a firearm in violation of section 12021, subdivision (a)(2). The jury found true the special circumstance allegation that the murders were committed during the commission of a robbery within the meaning of section 190.2, subdivision (a)(17). The jury also found true the allegation that the attempted murder was willful, deliberate and premeditated and the allegation that a principal was armed in the commission of the robberies within the meaning of section 12022, subdivision (a)(1). McLaurin and Lewis each admitted that he had suffered a prior serious felony conviction within the meaning of section 667, subdivision (a), and the Three Strikes law (sections 667, subdivisions (b) through (i), and 1170.12). Jordan admitted he had suffered two such convictions.

The trial court sentenced each appellant to a term of life in prison without the possibility of parole for each of the two murder convictions, plus a one-year term for the principal armed allegation and a five-year term for the section 667, subdivision (a) allegation.

The trial court sentenced McLaurin and Jordan to an additional 34 years to life in prison for the attempted murder, robbery and assault convictions pursuant to the Three Strikes law, plus seven five-year terms for the section 667, subdivision (a) allegation, for a total of 69 years to life in prison for those convictions.[2]

The court sentenced Lewis to an additional term of 175 years to life for the

---

[1]     All further statutory references are to the Penal Code unless otherwise specified.

[2]     Both men admitted they had served prior prison terms within the meaning of section 667.5, subdivision (b). The trial court struck those terms. The court stayed sentence on Jordan's firearm possession conviction pursuant to section 654.

2

attempted murder, assault and robbery convictions pursuant to the Three Strikes law, plus seven five-year terms for the section 667, subdivision (a) allegation, for a total of 210 years to life on those convictions.[3]

Appellants appeal from the judgment of conviction. McLaurin contends there is insufficient evidence to support his convictions, the trial court erred in instructing the jury on factually unsupported overt acts, the prosecutor committed misconduct by repeatedly asking co-defendant Jordan if other witnesses were lying, the trial court erred in telling potential jurors this was not a death penalty case, the trial court abused its discretion in admitting a hearsay statement by a conspirator without evidence that McLaurin was a member of that conspiracy, the admission of the hearsay statement was *Aranda-Bruton*[4] error, the trial court erred in failing to instruct the jury that it could not speculate about whether McLaurin was the person speaking on the phone registered to McLaurin, the prosecutor committed *Griffin*[5] error during closing argument, and the cumulative effect of the errors was prejudicial. McLaurin also contends he is entitled to one additional day of conduct credit.

Jordan contends the prosecutor committed *Brady*[6] error by suppressing a letter concerning an agreement to reduce a witness's sentence in exchange for testimony in this trial and the trial court erred in refusing to exclude all of that witness's testimony as a sanction. Jordan also contends the prosecutor committed misconduct by asking him if other witnesses were lying and by highlighting the absence of evidence the prosecutor successfully argued should be excluded. Jordan further contends that the court erred in refusing to allow him to present evidence that female DNA was found on an

---

[3]    The court stayed sentence on Lewis's firearm possession conviction pursuant to section 654.

[4]    The *Aranda-Bruton* rule is derived from *People v. Aranda* (1965) 63 Cal.2d 518 and *Bruton v. United States* (1968) 391 U.S. 123.

[5]    *Griffin v. California* (1965) 380 U.S. 609.

[6]    *Brady v. Maryland* (1963) 373 U.S. 83.

incriminating piece of evidence and in permitting the prosecutor to impeach him with his prior felony convictions for robbery. In addition, Jordan argues that the abstract of judgment incorrectly shows a section 667, subdivision (a) enhancement added to each of his determinate terms.

Lewis contends the prosecutor committed *Griffin* error by commenting on his failure to testify and misconduct by repeatedly asking Jordan if other witnesses were lying, and also contends the trial court violated his right to due process and a fair trial by telling the jury that this was not a death penalty case.

We affirm the judgment of conviction.

## Facts

### a. Prosecution's case

The robberies and murders charged in this case took place on April 5, 2010, at Custom City Auto Sales ("Custom City"), located on North Long Beach Boulevard in Compton. The day before the Custom City robberies and murders, Chendareth Meas, Sophorn Kol and Jason Moeum went to appellant Jordan's house in Long Beach to discuss a residential robbery. The residence was occupied by a Custom City employee. They went to a shed near Jordan's house. There were five men in the shed: appellants McLaurin, Jordan and Lewis, Jordan's brother Dontae Jordan ("Dontae") and John Denkins. Lewis, Jordan and Dontae discussed how the men should enter the residence to be robbed. The occupants were to be tied up. The men remained in the shed for 15 to 30 minutes. Dontae gave Meas and his companions a backpack which contained three guns

Meas and his companions left and drove to the home of Melvin Hoard, the employee of Custom City. They were joined there by Dontae and Denkins. The men waited for a period of time, then received a phone call stating that "some plans came up, and he—he's taking another direction." The men "made a plan to call it off for the night."

The next day, April 5, McLaurin went to Custom City in the late afternoon. He told those present that Johnny Williams had been released from jail, and said, "We're

4

going to party." McLaurin picked up a tequila bottle. Lejon Robins said, "That's my bottle." McLaurin put the bottle down and walked out.

According to Jordan's girlfriend Nicole Gyotoku, when she arrived home from work on April 5, Jordan was in the backyard with seven or eight people. The people included Lewis, McLaurin, Dontae, a woman called Jolly and Kol. The men became quiet as she walked down the driveway. Gyotoku went inside and watched television. After about an hour, Jordan came inside and Gyotoku realized the others had left. Jordan said he was leaving and would be back in an hour. He left in his black Jeep.

According to Meas, he learned in the late afternoon that he, Kol and Moeum were going to do a robbery.[7] The men again went to Jordan's house. According to Meas, when they arrived, McLaurin, Jordan, Lewis, Dontae and Denkins were standing in front of the driveway, near the sidewalk, in a group. Meas pulled into the driveway. Dontae approached the vehicle and told the men "to get some duct tape and latex gloves and get ready; that we're going to be tying people up."

Meas saw everyone but McLaurin leave. Denkins and Dontae drove to the area of Custom City in Denkins's Malibu. Jordan and Lewis drove there in a black Jeep. Meas followed in his van. All the vehicles parked on Bullis Road near Custom City. Kol told Meas that McLaurin was the inside man on the job and it might be necessary to tie him up. McLaurin's cell phone records show that he too drove to the area of Custom City, placing a call from there at 6:48 p.m.

At 7:35 p.m., McLaurin called Jordan, who was also in the vicinity of Custom

---

[7] Meas, Kol and Moeum were tried separately in Los Angeles County Superior Court case No. TA111652. McLaurin requests that we take judicial notice of the briefs filed in their appeals, in case Nos. B243664 and B24688. Specifically, he urges that we take notice of the fact that his name is not mentioned in Kol's or Moeum's briefs, and is mentioned only once in Meas's brief, and then only to note that McLaurin was tried later. He contends the absence of his name is indicative of his lack of involvement in the crimes and of a great likelihood that Meas perjured himself in this trial. We deny McLaurin's request that we take judicial notice of the substance of these briefs. The briefs were prepared by appellate lawyers, and at most reflect their assessments of which facts are significant on appeal. The briefs are not probative of perjury in this trial.

City. The men spoke for over 26 minutes. During the conversation, Jordan called Denkins and the three men talked. The call ended about 8:02 p.m.

At some point, Dontae brought the backpack with the guns to Meas's van. Lewis and Jordan got into the front of the van. Denkins got into the back. Dontae opened the backpack. Jordan took a .22-caliber sawed-off rifle, Lewis a .38-caliber handgun, Denkins a nine-millimeter handgun and Dontae a .45-caliber handgun. Lewis drove the van to Custom City and parked on the driveway facing Long Beach Boulevard.

Inside Custom City, a group of people were watching a "March Madness" basketball game in a middle room. The group included Kimberly Carnes, Shawn Simon, Robins, Gary Samuel and Mark Richardson. Hoard and Arrington were in the front, in the shop. Christopher Williams and Vance Dean were near the back door of the business.

At about 8:00 p.m., Lewis and Jordan entered Custom City through the back door. They asked Christopher if they could buy some marijuana. When Christopher replied that he did not have any to sell, either Jordan or Lewis started to pull out a gun. Christopher shoved one of the men, then hid. Christopher heard a gunshot.

Jordan and Lewis went to the front of the business. Another man with a gun came in the back door and then also walked toward the front. Hoard approached the three men and told them he was about to close. Jordan pulled out a gun. Hoard and Arrington attempted to flee, but Jordan stopped them. Jordan put his gun in Hoard's face and demanded money. Hoard gave him money, saying, "Don't kill me." Jordan pulled the trigger of his gun, but it did not fire, apparently because the safety was on. Jordan tried to take the safety off.

Sounds of arguing and fighting came from the back. Jordan went toward the back. Arrington and Hoard fled out the front door. Arrington heard gunshots as they left the building and more gunshots as they moved away. The gunshots were coming from different guns.

The fight in the back appears to have involved Dean. At some point, Dean fell to the ground. He died from a gunshot wound to his head. Richardson was nearby and was shot in the back. He was able to run out the back door. He saw a van with its engine

6

running backed into the parking lot. A man ran by him, possibly the man who had been fighting with Dean. Richardson was shot again. He fell backwards and went underneath a tent near a toolbox.

Carnes, Simon and Samuel, who were still in the middle room, heard gunshots from at least two guns. They all tried to hide. The gunshots got closer. Robins, who had a gun, tried to close the door. He fired his gun. The gun either jammed or ran out of ammunition. Robins was shot in the head, and later died from his wounds.

Carnes, who was behind a counter, heard Simon tell Samuels to play dead. Jordan and Lewis entered the room. Jordan took money from Robins's pocket. Jordan and Lewis came behind the counter, saw Carnes hiding there, pointed their guns at her, asked her where the box was and when she said she did not know, took her change and keys.

Jordan and Lewis searched a cabinet, then asked Simon where the money and the speaker box were. Simon said he did not know what they were talking about. Jordan took Simon's watch. He also took $500 from Samuel. A third man appeared and said, "We killed another nigga. Let's go." Jordan and Lewis left.

Richardson, still on the ground outside, saw three men leave the building and enter the sliding doors of the parked van. The van then drove away. Samuel came out of the building, checked on Richardson and then left because he did not want to be involved.

Johnny Williams, who had been in a back room near the office when the shooting started, remained hidden there throughout the robberies and shootings. He came out about five or six minutes after the shooting stopped, when he heard tires screeching. He left the business. Johnny noticed a van on Compton Boulevard moving toward Ward. Johnny met Hoard and Simon on Compton Boulevard.

Johnny received a call from McLaurin. McLaurin asked where he was and what was going on. McLaurin also asked Johnny if he was okay.

Martina Holmes arrived at Custom City shortly after 8:00 p.m., intending to pick up Arrington. When she drove into the parking lot at Custom City, she found that the gate was blocked by a van. She wrote down the van's license plate number and drove out of the parking lot. She then saw Lewis, Jordan and two or three other men run out the

7

back door of the business.  Two of the men had guns.  They got into the van, which then drove away.

Holmes picked up Arrington at the corner of Long Beach Boulevard and Palmer.  When she turned onto Palmer, she realized the van from Custom City was behind her.  When she turned onto Bullis, the van also turned.  Homes saw police cars approaching on Bullis.  She pointed at the van and yelled, "They're behind us."

Los Angeles County Sherriff's Deputies Peter Tovar and his partner responded to a robbery call for Custom City, as did Deputy Timothy Lee and his partner.  Deputy Tovar saw a green Astro van with its lights off turn onto Bullis from Palmer.  He said. "that's the van" and made a U-turn to follow the van.  Deputy Lee did the same.

Meas, who was driving the van, stopped it where the Jeep and Malibu were parked.  Two men got out of the van.  Deputy Lee detained one of the men.

Meas drove away at a high rate of speed.  Deputies Mark Yzabal and his partner got behind the van as it traveled on Ward.  Meas stopped the van near the entrance to an alley.  Meas got out and ran through the alley.  Jordan and two other men got out of the van on the passenger side and ran through the alley.  Deputy Tovar followed the men, who jumped fences into backyards.  Deputy Yzbal and his partner chased and caught Lewis.  Deputy Lee cut off and detained Dontae as he ran through backyards. Dontae later died in custody.  Meas was found under an abandoned house.

Deputy Sumner and Deputy Richardson set up a containment area on Laurel.  Deputy Sumner saw Jordan trying to get under a vehicle in the middle of the block.  He yelled at Jordan.  Jordan got up and jumped over a fence into a backyard.  Deputy Sumner found a black leather jacket under the vehicle.

Detective Scott Lawler saw Jordan on the roof of the house at 219 South Ward.  Jordan jumped down from the roof of the house and disappeared.

Bobbie Dent lived in the house at 219 South Ward.  She heard her dog barking, opened her door and saw a person who asked to be let in.  She refused.  The man said someone was trying to kill him.  Dent said she would get help.  Her husband called the police.

Detective Lawler returned to the Dent house, went down the driveway, found Jordan in the back of the house and arrested him. Deputies took Jordan and Lewis to a location near Custom City for a field showup. Arrington, Simon and Holmes identified both men. Carnes identified Jordan.

Jordan and Lewis testified positive for gunshot residue.

Various items, including a backpack, baseball caps, ski masks and several firearms, were recovered from the van.

More evidence was discovered the next day. Gyotoku found Jordan's Jeep on Bullis Road. Sergeant Rodriguez found a loaded Heckler and Koch nine-millimeter pistol in the roof gutter of the house at 219 South Ward. A metal watch was found inside the black leather jacket recovered from underneath the vehicle. Simon identified it as the one stolen from him during the robbery. Detective Perry obtained black velour sweat pants from Lewis.

The firearms recovered from the van and roof of the house were tested. The Heckler and Koch nine-millimeter gun recovered from the roof fired one bullet recovered from Robins's body. The rifle from the van also fired one of the bullets recovered from Robins's body. The Colt .45 from the van fired a bullet and three cartridges recovered at the scene. A Lorcin .380 fired one bullet fragment and two cartridges recovered at the scene.

Various items recovered in connection with the investigation into the crime contained DNA, which was tested. Criminalist Cristina Gonzalez determined that blood stains on Lewis's pants contained a mixture of DNA from Lewis and Richardson. The Lorcin pistol contained Robins's DNA. Blood stains on a black leather jacket found near the site of Dontae's arrest matched Robins's DNA profile. A swab from the collar of the jacket found under the vehicle contained a mixture of DNA with Jordan being the major contributor. A swab from the backpack's zipper contained a mixture of DNA with McLaurin being a possible contributor. Blood recovered from inside the van matched Robins's DNA.

About a month after the crimes, Detective Perry showed Christopher some six-

pack photographic lineups. Christopher identified Lewis's photograph in one lineup. Christopher believed that he identified Jordan in another line-up, but Detective Perry believed that Christopher merely showed an interest in Jordan's photograph. In September, 2010, Detective Perry also showed Samuel a six-pack photographic lineup. Samuel identified Jordan.

Police obtained cell phone records for Jordan and McLaurin. These records were analyzed by the FBI to show which cell phone towers the phones used when making a call.

Records for McLaurin's phone showed that he made a call to Jordan's phone at 6:49 p.m., connecting through a cell tower 130 yards from Custom City. The call lasted 10 minutes. Jordan's phone did not use a cell tower near Custom City. McLaurin again called Jordan from the Custom City area at 7:35 p.m. This time, Jordan's phone used a cell tower near Custom City. The call lasted over 26 minutes. Jordan's phone records show that during his conversation with McLaurin, Jordan called Denkins, using the three-way call feature on his phone. Denkins was on the call for about 14 minutes. The call between McLaurin and Jordan lasted over 26 minutes, ending at about 8:02 p.m. At 8:09 p.m., 8:10 p.m. and 8:22 p.m., McLaurin called Johnny Williams. These calls connected through cell towers that were southeast of Custom City, and show McLaurin was moving away from Custom City.

Jordan's phone records show that he was using his phone in the area of Custom City until 8:29 p.m.

b. Defense

Jordan presented the testimony of Thomas Fedor, a forensic serologist at the Serological Research Institute (SERI). Fedor extracted DNA from a blue ski mask and analyzed it. There was a mixture of DNA on the mask. Denkins was the major contributor.

Jordan also presented the testimony of Michelle Acevedo, a forensic identification specialist for the Sheriff's Department. She took photographs at four locations related to

10

the crimes.  One of those photographs showed a blue ski mask and a black leather jacket together.

Jordan also testified in his own behalf.  He explained his relationships to the other participants in the crime.  Dontae was his brother, and kept some clothing in the shed next to Jordan's house.  Lewis was the father of Jordan's cousin's child.  Jordan's mother and McLaurin's mother were friends.  Jordan had a chance encounter with McLaurin in January or February 2010.  Denkins was friends with Dontae.  Kol was a neighbor who was friends with Dontae.  Jordan did not know Meas or Moeum.

On April 5, at about 6:00 p.m., Jordan was at home, outside on the side of his house.  Denkins and Kol  came over and said Dontae told them to wait in the shed while he used the bathroom.  Jordan's uncle and his uncle's friend also came to the shed.  Meas and Moeum were not there.

Gyotoku arrived home and went inside.  Dontae came to the shack and suggested Jordan go inside.  Dontae returned Jordan's phone.  Dontae had borrowed it for a couple of days.  Dontae, Kol and Denkins left.  Jordan went inside.

Later, Dontae called Jordan and said he was having problems breathing.  Dontae said he was at Compton and Bullis.  Jordan left in his Jeep to check on Dontae.  He got a call from Dontae's girlfriend Rolanda, who was looking for Dontae.  Jordan explained that he was going to get Dontae.  Jordan remained on the phone with her for about 20 minutes, but did not talk with her the whole time.  Jordan tried to call Dontae, but no one answered the phone.

Jordan saw police at Compton and Long Beach Boulevard.  He ended up parking on Bullis near a cemetery.  He saw police everywhere, but did not see Dontae.  He tried unsuccessfully to call Dontae.

Jordan got out of the Jeep and began walking around to look for Dontae.  A police officer stopped him from crossing Compton.  Jordan went to Ward Street, where he saw a police car by a van.  Jordan walked down Ward Street, but a police officer told him to go back to his house.  Jordan said that he was looking for his brother, but the officer told him to go back to his house.  Jordan walked away, but stopped at a driveway to call Dontae

11

again. The police officer told Jordan to get in his house right now.

Jordan walked up the driveway. A dog started barking and a woman opened the door of the house and asked him what he was doing. Jordan said that a police officer told him to get off the street. The woman said her husband was calling the police.

Jordan waited in the carport area of the house. He called Gyotoku and told her he might be going to jail. The police came and arrested him. He was never on the roof of the house.

Jordan denied placing a jacket or ski mask under a vehicle on Laurel. He did not recognize the ski mask or jacket the police found there.

Lewis's defense was a stipulation that Simon and Carnes had failed to identify him at another trial related to the Custom City crimes and instead indentified Denkins as the second man. Lewis also offered brief testimony from a deputy that Lewis did not have a "K.B." tattoo on his left arm.

McLaurin did not present any witnesses or evidence in his defense.


Discussion

1. Sufficiency of the evidence

McLaurin contends there is insufficient evidence to support his convictions for murder, attempted murder and robbery. He argues that the evidence at most showed that he was present during a discussion of a potential house robbery which ultimately never took place. We do not agree.


a. Sufficiency of the evidence

"'In reviewing a challenge to the sufficiency of the evidence, we do not determine the facts ourselves. Rather, "we examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citations.] We presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.

12

[Citation.] [¶] The same standard of review applies to cases in which the prosecution relies primarily on circumstantial evidence and to special circumstance allegations. [Citation.] "[I]f the circumstances reasonably justify the jury's findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding." [Citation.] We do not reweigh evidence or reevaluate a witness's credibility. [Citation.]'" (*People v. Nelson* (2011) 51 Cal.4th 198, 210 [internal quotation marks omitted].)

"Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.]" (*People v. Maury* (2003) 30 Cal.4th 342, 403.)

b. Aider and abettor and conspirator liability

"[A]n aider and abettor is a person who, 'acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages, or instigates, the commission of the crime.'" (*People v. Prettyman* (1996) 14 Cal.4th 248, 259.) "'[An aider and abettor] is guilty not only of the offense he intended to facilitate or encourage, but also of any reasonably foreseeable offense committed by the person he aids and abets. . . .'" (*Id.* at p. 261.)

Mere presence at the scene of a crime and even knowledge that a crime is being committed are not sufficient to prove aiding and abetting. (*People v. Campbell* (1994) 25 Cal.App.4th 402, 409.) However, factors such as presence at the scene of the crime, companionship with the perpetrators, and conduct before and after the offense may circumstantially prove aiding and abetting. (*Ibid.*)

The necessary elements of a criminal conspiracy are (1) an agreement between two or more persons; (2) with the specific intent to agree to commit a public offense; (3) with the further specific intent to commit that offense; and (4) an overt act committed by one or more of the parties for the purpose of accomplishing the object of the agreement or

13

conspiracy. (*People v. Russo* (2001) 25 Cal.4th 1124, 1131.) It is not necessary to show that the parties met and actually agreed to perform the unlawful acts nor that they had previously arranged a detailed plan for the execution of the conspiracy. (*People v. Vu* (2006) 143 Cal.App.4th 1009, 1024-1025.)

Generally, a conspiracy is established by circumstantial evidence. (*People v. Vu, supra*, 143 Cal.App.4th at pp. 1024-1025.) "The existence of a conspiracy may be inferred from the conduct, relationship, interests, and activities of the alleged conspirators before and during the alleged conspiracy. [Citations.]" (*People v. Cooks* (1983) 141 Cal.App.3d 224, 311.) Only slight corroboration is needed to connect a defendant to an alleged conspiracy. (*People v. Harper* (1945) 25 Cal.2d 862, 876-877.) "Furthermore, the independent proof required to establish the existence of a conspiracy may consist of uncorroborated accomplice testimony." (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1134-1135.)

c. Evidence

Meas's testimony showed McLaurin's awareness of the planned crimes and his involvement in those crimes. Meas placed McLaurin at Jordan's house on April 4, when the mechanics of robbing an employee of Custom City at his home were discussed, including the need to tie up the occupants of the house. Meas placed McLaurin at Jordan's house again on April 5, when Dontae told Meas "to get some duct tape and latex gloves and get ready; that we're going to be tying people up." In connection with the April 4 statements, the April 5 statement suggests another robbery was planned. Meas also testified that Kol told him that McLaurin was the inside man for the robbery at Custom City and it might be necessary to tie him up.

Meas's testimony was supported by testimony from other witnesses and phone records showing McLaurin's movements around Long Beach and Compton on April 5. McLaurin went to Custom City hours before the robbery, then went to Jordan's house where the robbers were gathered, then returned to the area of Custom City and stayed there until shortly after the robbery occurred. These movements are consistent with

14

involvement in the robbery.

McLaurin's activity in the Custom City area around the time of the robbery is also consistent with involvement in the robbery. McLaurin called Jordan from the area at 6:48 p.m. and spoke with him for 10 minutes. Jordan was not in the Custom City area at that time. McLaurin again called Jordan at 7:35 p.m. Jordan was then in the area of Custom City, and the two men spoke for over 26 minutes. During this conversation, Jordan called Denkins, another of the robbers, using the three-way call feature on his phone.[8] The call to Jordan ended at 8:02 p.m., about the time Jordan and the others began the robbery of Custom City.

The timing of McLaurin's movements and phone calls to Jordan support a reasonable inference that McLaurin was acting as a scout, look-out or inside person for the robberies. This is sufficient to prove he aided and abetted the robberies and was a member of a conspiracy to commit the robberies. He was an integral part of the robberies and so "under the felony-murder rule, guilty of murder" as well. (*People v. Em* (2009) 171 Cal.App.4th 964, 971.)

McLaurin attacks much of the evidence offered at trial and discussed above. We consider many of these claims individually and in detail throughout this opinion. We consider attacks on Meas's credibility in section 9. We consider McLaurin's attacks on the cell phone evidence in section 7. We consider his attack on the backpack DNA evidence in section 2. With the exception of the backpack evidence, we find that his contentions lack merit. We have not considered the backpack evidence in assessing the sufficiency of the evidence.

Other attacks by McLaurin are simply attempts to view the evidence in the light least favorable to the verdict rather than most favorable to the verdict as is required by law. For example, McLaurin points out that Gyotoku, who placed him at Jordan's house on April 5, identified him only by his body shape, and could not identify him by viewing his face. It was for the jury to decide how much weight to accord this identification,

---

[8] According to Meas, Jordan and Denkins drove to Custom City in separate cars.

which was based on McLaurin's unusual body shape.

McLaurin also points out that Gyotoku's testimony about seeing him and the other men in her yard at 6:00 p.m. conflicts with phone records showing McLaurin calling Jordan at 6:07 p.m. and with Samuel's testimony that McLaurin's visit to Custom City occurred at about 6:00 p.m. While the cell phone records are precise as to time, Gyotoku's testimony and Samuel's testimony are not. Both individuals provided broad estimates of times, and those estimates were not consistent throughout their testimony. It was the jury's task to decide what parts, if any, of Gyotoku's and Samuel's testimony to believe. "Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment." (*People v. Maury, supra,* 30 Cal.4th at p. 403.)

McLaurin also contends that there is no evidence that he participated in any discussions about the house robbery or the Custom City robbery, or that he agreed to participate in those robberies. There is no requirement that a conspirator participate in discussions about the crime. (See *People v. Vu, supra*, 143 Cal.App.4th at p. 1025; *People v. Cooks, supra*, 141 Cal.App.3d at p. 312.) There is no direct evidence that McLaurin expressly agreed to participate in the robbery, but such evidence is not required. His agreement to participate may be inferred from his conduct before, during and after the robbery.

"[I]t is the [trier of fact], not the appellate court, which must be convinced of the defendant's guilt beyond a reasonable doubt." (*People v. Ceja* (1993) 4 Cal.4th 1134, 1139.) Thus, when as here, "the circumstances reasonably justify the [trier of fact's] findings, the reviewing court may not reverse the judgment merely because it believes that the circumstances might also support a contrary finding." (*Id*. at p. 1139.)

2. Overt acts instruction

The jury was instructed on conspiracy as a theory of liability for the crimes. McLaurin contends there was no factual basis for overt acts 2, 3 and 6 and so the trial court erred in instructing the jury that they could consider those acts in determining

16

whether McLaurin was a member of the uncharged conspiracy to commit robbery.[9]

### a. Applicable instructional law

Giving a factually unsupported instruction is error. (*People v. Cross* (2008) 45 Cal.4th 58, 67 [since there was no evidence defendant personally performed abortion, court erred in instructing jury that pregnancy or an abortion could constitute great bodily within the meaning of the section 12022.7 great bodily injury allegation]; *People v. Guiton* (1993) 4 Cal.4th 1116, 1129.)

### b. Overt act law

"A conviction of conspiracy requires proof that the defendant and another person had the specific intent to agree or conspire to commit an offense, as well as the specific intent to commit the elements of that offense, together with proof of the commission of an overt act by 'one or more of the parties to such agreement' in furtherance of the conspiracy." (*People v. Morante* (1999) 20 Cal.4th 403, 416.)

"[A]ny one of the conspirators, and not necessarily the charged defendant, may commit the overt act to consummate the conspiracy. [Citations.] Disagreement as to who the coconspirators were or who did an overt act, or exactly what that act was, does not invalidate a conspiracy conviction, as long as a unanimous jury is convinced beyond a reasonable doubt that a conspirator did commit some overt act in furtherance of the conspiracy." (*People v. Russo, supra,* 25 Cal.4th at p. 1135.)

---

[9] Respondent contends McLaurin failed to object to overt act 6 and so has forfeited his claim that the act is not supported by the evidence. There is a split of authority on this issue. (See, e.g., *People v. Valdez* (2004) 32 Cal.4th 73, 137 [failure to object forfeited claim that CALJIC No. 206 improperly given because unsupported by evidence]; *People v. Hannon* (1977) 19 Cal.3d 588, 600 [pursuant to § 1259, lack of trial objection did not forfeit appellate review of claim that instruction lacked evidentiary support].) We consider the claim pursuant to section 1259. (*People* v. *Andersen* (1994) 26 Cal.App.4th 1241, 1249.)

c.  Sufficiency of the evidence

Here the court instructed the jury on nine possible overt acts, three of which referred to McLaurin by name.  McLaurin contends there was no evidence to support acts numbers 2, 3 and 6, the three acts which referred to him by name.

Overt act number 3 stated:  "Mclaurin went to Custom City to scout location for robbery."  Overt act number 6 stated:  "Paul Jordan, Mclaurin and Denkins had a 25 minute telephone conversation in the area of Custom City half hour before the robbery."  As we discuss in detail in section 7, there is sufficient evidence to show that this phone call occurred and to support an inference that McLaurin was in the area of Custom City before the robbery to provide information to the others.  Thus, there was sufficient evidence to support the jury on these two overt acts.

We agree that there was no evidence to support overt act number 2, which stated:  "[McLaurin] provided backpack."  The only evidence linking McLaurin with the backpack was the presence of his DNA on the zipper handle.  There was DNA from two other people on the zipper and from at least two more people on the backpack strap, and there was no way to know when McLaurin contributed his DNA.  Any one of those four other people could have provided the backpack to the conspirators.  The mere fact that McLaurin touched the backpack at some point does not support an inference that he provided the backpack to the conspirators.

d.  Prejudice

McLaurin contends that the factually unsupported instruction in this case amounted to misinstruction on an element of the offense and so is subject to the harmless error analysis of *Chapman v. California* (1967) 386 U.S. 18.  He is mistaken.  "[T]he requirement of an overt act is an element of the crime of conspiracy in the sense that the prosecution must prove it to a unanimous jury's satisfaction beyond a reasonable doubt.  But that element consists of *an* overt act, not a *specific* overt act."  (*People v. Russo supra,* 25 Cal.4th at p. 1134 [italics in original].)

18

"[G]iving an irrelevant or inapplicable instruction is generally '"only a technical error which does not constitute ground for reversal."' [Citation.]" (*People v. Cross, supra,* 45 Cal.4th at p. 67.) In cases where a jury instruction is factually unsupported, "affirmance is the norm." (*People v. Guiton, supra,* 4 Cal.4th at p. 1129.) However, there may be some instances where reversal is appropriate. (*Ibid*.) Giving a factually unsupported instruction is state law error, subject to the traditional *Watson* test. (*Id*. at p. 1130.)

In determining whether there was prejudice from the unsupported instruction, the entire record should be examined, including the facts and the instructions, the arguments of counsel, any communications from the jury during deliberations, and the entire verdict. (*People v. Guiton, supra*, 4 Cal.4th at p. 1130.) "[T]he appellate court should affirm the judgment unless a review of the entire record affirmatively demonstrates a reasonable probability that the jury in fact found the defendant guilty solely on the unsupported theory." (*Ibid*.) We see no such probability here.

The jury was instructed generally with CALCRIM No. 200, which told the jury: "You must decide what the facts are. It is up to all of you, and you alone to decide what happened, based only on the evidence that has been presented to you in this trial." The instruction also stated: "Some of [the] instructions may not apply, depending on your findings about the facts of the case. Do not assume just because I give a particular instruction that I am suggesting anything about the facts. After you have decided what the facts are, follow the instructions that do apply to the facts as you find them." More specifically, CALCRIM No. 416 told the jury that "the People must prove . . . [o]ne of the defendants or all of them committed at least one of the following overt acts. . . ." The instruction also stated: "To decide whether the defendant committed one or more of the overt acts, consider all of the evidence presented about the acts."

Viewing the instructions as a whole, we conclude the jury in this case would have understood that its duty was to determine whether or not any of the overt acts actually occurred. (See *People v. Cross, supra*, 45 Cal.4th at p. 67 [concluding that in light of similar general instruction on applicability of instructions given, jury would have

19

understood that its duty was to determine whether defendant committed one of the acts listed in the great bodily injury instruction].)

Further, nothing in the record suggests that the jury erroneously relied on overt act number 2 alone as the overt act supporting a finding of conspiracy. The jury was correctly instructed that it had to agree that at least one overt act was committed "by at least one alleged member of the conspiracy, but you do not have to all agree on which specific overt act or acts were committed or who committed the overt act or acts." Thus, the jury was aware that there was no requirement to find that McLaurin personally committed an overt act.

McLaurin does not dispute the adequacy of the evidence to support the other six overt acts which do not mention him by name. Further, as we discuss above, there is sufficient evidence to support overt acts numbers 3 and 6, which mention McLaurin by name. Nothing in the record affirmatively suggests that the jury ignored the eight overt acts which were supported by sufficient evidence and instead relied on overt act number 2 alone. Accordingly, McLaurin has not shown prejudice from the error.

3. Prosecutor's questions about lying

McLaurin and Jordan contend the prosecutor committed misconduct when she repeatedly asked Jordan if he thought other witnesses were lying.[10] Lewis joins in this claim.

---

[10] Respondent contends that McLaurin has forfeited this claim because he did not object or join in the objections by counsel for Jordan and Lewis. (See *People v. Chism* (2014) 58 Cal.4th 1266, 1292-1293.) In light of the trial court's repeated rejection of the objections and argument by counsel for Jordan and Lewis, any additional objection by McLaurin would have been futile. Accordingly, McLaurin's claim is not forfeited. (See *People v. Hill* (1998) 17 Cal.4th 800, 802.)

We note that appellants also contend the prosecutor committed misconduct during closing argument and by violating the disclosure requirements of *Brady v. Maryland, supra*, 373 U.S. 83. We consider these claims in sections 9 and 10.

### a. Prosecutorial misconduct

"Although it is misconduct for a prosecutor *intentionally* to elicit inadmissible testimony [citation], merely eliciting evidence is not misconduct." (*People v. Scott* (1997) 15 Cal.4th 1188, 1218.) There is no categorical prohibition on asking a witness if he believes another witness whose testimony differs from his own is intentionally lying or merely mistaken. (*People v. Chatman* (2006) 38 Cal.4th 344, 382.) Thus, it is difficult to ascribe misconduct to a prosecutor who asks a witness if another witness is lying, particularly when, as here, the trial court repeatedly overrules defense objections to the questions. "Defendant's real argument is that the evidence was inadmissible." (*People v. Scott, supra*, 15 Cal.4th at p. 1218.)

### b. Admissibility of evidence

"A defendant who is a percipient witness to the events at issue has personal knowledge whether other witnesses who describe those events are testifying truthfully and accurately. As a result, he might also be able to provide *insight* on whether witnesses whose testimony differs from his own are intentionally lying or are merely mistaken." (*People v. Chatman, supra,* 38 Cal.4th at p. 382 [italics added].) For example, the defendant might claim that he had "better vantage point from which to observe the event" or know of "facts that would show a witness's testimony might be inaccurate." (*Id*. at p. 383.) In instances where he "knows the other witnesses well, he might know of reasons those witness might lie." (*Id*. at p. 382.) A defendant's insight into facts or motives "would properly assist the trier of fact in ascertaining whom to believe." (*Id*. at p. 383.)

"If a defendant has no relevant personal knowledge of the events, or of a reason that a witness may be lying or mistaken, he might have no relevant testimony to provide. No witness may give testimony based on conjecture or speculation. (See Evid. Code, § 702.)" (*People v. Chatman, supra*, 38 Cal.4th at p. 381.)

### c. Questions

Appellants object to questions the prosecutor asked Jordan about the credibility of

the testimony of Deputy Lawler, Ms. Dent and Deputy Sumner.

Jordan was arrested in the yard of the very house where Deputy Lawler claimed to have seen someone on the roof and so might have been expected to offer insight into why the deputy believed he saw Jordan on the roof. Jordan might, for example, have testified that he saw another man on the roof. Thus, the prosecutor properly initially asked Jordan if he thought Deputy Lawler was mistaken. Jordan, however, replied that Deputy Lawler was "more than mistaken," a phrase which implied that the deputy was lying. Only then did the prosecutor ask if Jordan believed that Deputy Lawler was lying. Since the prosecutor was simply clarifying Jordan's earlier answer, the question was not improper. There was, however, no reason for the prosecutor to ask this question again later in the cross-examination.

Similarly, Jordan was involved in a brief conversation with Ms. Dent, the occupant of the house where he was arrested and so might have been expected to offer insight into differences between her account of the conversation and his. In fact, that is what occurred. The prosecutor asked Jordan if he told Dent that "five [guys] had been chasing you or were trying to kill you?" Jordan replied, "No." The prosecutor asked, "So Ms. Dent is mistaken about her testimony; is that correct?" Jordan replied, "She didn't say that." Jordan was correct. Dent testified that Jordan "said that someone was trying to—to kill him or something to that effect. I can't remember word for word." The prosecutor then asked Jordan what he did say to Dent. Jordan stated, "I don't know exactly like verbatim what I said, because I was kind of . . . not myself at that time. . . . They might shoot me or anything. And I'm really trying to express to her what I'm doing there. And I—to be honest, I know it's not coming out right." Thus, Jordan's testimony did offer insight into the differences in testimony and could have assisted the trier of fact in deciding whom to believe.

The same is not true for the prosecutor's question about Deputy Sumner. Jordan's testimony showed that he had no relevant personal knowledge of the chase described by Deputy Sumner. Without this personal knowledge, Jordan had no way to know if Deputy Sumner was mistaken or lying when he testified that the person he observed was Jordan.

22

Further, like one of the defendants discussed in *Chatman*, Jordan was "a stranger to the officers, [and] had no basis for insight into their bias, interest or motive to be untruthful. Had the prosecutor asked why they might lie, which she did not, it would have been apparent that any answer would have been speculative." (*People v. Chatman, supra*, 38 Cal.4th at p. 381 [discussing *People v. Zambrano* (2004) 124 Cal.App.4th 228].) It is difficult to see how Jordan's testimony about Deputy Sumner's veracity could "properly assist the trier of fact in ascertaining whom to believe." Jordan, however, did not offer testimony about Sumner's veracity. He responded only that, "I don't know who he saw. He didn't see me though." Thus, the question did not result in the admission of any inadmissible evidence. [11]

### d. Prejudice

Whether the questions are viewed as prosecutorial misconduct or the erroneous admission of evidence, the standard of review is the same. A defendant's conviction will not be reversed unless it is reasonably probable that the jury would have reached a result more favorable to the defendant had the misconduct or error not occurred. (*People v. Zambrano, supra*, 124 Cal.App.4th at p. 243 [prosecutorial misconduct]; *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 76 [erroneous admission of evidence generally].)

The danger of allowing a prosecutor to elicit testimony from a defendant that another witness is lying, is that the accusation will diminish the defendant's credibility. (See, e.g., *People v. Zambrano, supra*, 124 Cal.App.4th at p. 243 [by forcing the defendant to call police officers liars, prosecutor used a "represensible method" to persuade the jury that defendant was not credible].)

---

[11]   We note that following this exchange, the prosecutor unnecessarily asked Jordan a second time if Deputy Lawler was lying when he said he saw Jordan on the roof, and Jordan replied that "if either one of [the deputies] said they saw me period, they're making it up." Thus, Jordan did ultimately accuse Deputy Sumner of lying, but it was not in response to a question about Deputy Sumner. Defense counsel did not object to the answer as nonresponsive or request the answer be stricken.

Although the prosecutor had no basis to ask Jordan if he believed that Sumner was lying, Jordan did not testify that that Sumner was lying. Thus, Jordan's credibility was not diminished by his answer. Jordan in effect volunteered that Lawler was lying and any diminution of his credibility was self-inflicted. However, even if we assume that the prosecutor should not have asked follow up questions designed to make it clear that Jordan was accusing Deputy Lawler of lying and thereby contributed to the diminution, we would see no reasonable probability that Jordan would have obtained a more favorable outcome in the absence of the questions.

Here, the evidence against Jordan, whose credibility was attacked, was very strong. Meas's testimony unequivocally implicated Jordan in the crimes. Four of the victims identified Jordan as one of the robbers. He was arrested not far from the scene of the crimes, shortly after the crimes occurred. After his arrest, he tested positive for gunshot residue. A Heckler and Koch nine-millimeter gun was recovered outside the house where Jordan was arrested. The gun fired one bullet recovered from Robins's body and two casings recovered at the scene. Jordan's claim that he was in the area to find his brother was not believable. Thus, there is no reasonable probability that Jordan would have received a more favorable outcome in the absence of any improperly admitted testimony about the credibility of others.

The result is the same for McLaurin and Lewis. They could have benefited if the jury had found Jordan's testimony credible. However, as we have explained, there is no reasonable probability that the jury would have found Jordan more credible in the absence of the lying testimony and thus no reasonable probability that McLaurin or Lewis would have received a more favorable result.

4. Court's death penalty comments

McLaurin and Lewis contend the trial court erred in advising the jury that this case did not involve the death penalty. McLaurin argues the court's comments suggested this was a more egregious crime than usual because it could have been a death penalty case. Lewis contends the court's comments suggested that the consequences of conviction

24

were not great, and so the jurors would have been more willing to convict event with reasonable doubt. Lewis additionally contends the comment violated his right to due process and a fair trial. Jordan joins these claims. The trial court did not err.

During voir dire, the trial court told prospective jurors, "Folks, I just want to remind you one more time that if you are selected to sit on this case as jurors, that you're not to be concerned with punishment. That's where I come in. . . . [¶] . . . And in case any of you are concerned, this is not a death penalty case. There is no death penalty involved in this case. [¶] Okay. I know a lot of times people are kind of nervous because they think maybe it is, but it's not."

The court's comments were proper. Jurors are routinely instructed that they should not be concerned with punishment. (CALCRIM No. 3550 ["You must reach your verdict without any consideration of punishment"]; see *People v. Nichols* (1997) 54 Cal.App.4th 21, 24.) We agree with our colleagues in the Fourth District Court of Appeal that it is proper for a trial court to inform the jury that the death penalty is not a possibility in the case. (*People v. Hyde* (1985) 166 Cal.App.3d 463, 479.) As the court explained: "The public commonly understands that in contrast to other criminal cases, the jury in a death penalty murder case must determine penalty as well as guilt. The moral and ethical questions surrounding the use of the death penalty have generated considerable social debate. It is reasonable to anticipate that a significant number of prospective jurors might question their ability to sit on a jury which potentially would have to consider imposition of a sentence of death. Not only did the trial judge's decision to raise and dispose of the issue at the outset save time and unnecessary strain on potential jurors' psyches, but it also avoided any possibility that a prospective juror's concern about serving on a death penalty case might skew his answers to voir dire questioning." (*Ibid.*)

5. Coconspirator statement

McLaurin contends the trial court abused its discretion in admitting Meas's testimony that Kol told him that McLaurin was going to be the inside man for the

robbery. The statement was admitted under the conspiracy exception to the hearsay rule but McLaurin contends no evidence was ever presented showing that he was a member of the conspiracy. McLaurin further contends that once the trial court decided to admit the statement, the court had a duty to give a limiting instruction on the statement.

Respondent contends, and we agree, that McLaurin has forfeited this claim by failing to object on the specific ground that there was no evidence that he was a member of the conspiracy. (See *People v. Dykes* (2009) 46 Cal.4th 731, 757 [failure to object to "claimed evidentiary error on the same ground asserted on appeal results in a forfeiture of the issue on appeal"]) McLaurin's counsel initially objected that the statement was hearsay, and the prosecutor responded that the statement fell within the exception for a statement by a co-conspirator. (Evid. Code, § 1223.) McLaurin's counsel responded by addressing a different aspect of Meas's testimony, which she argued was speculation. At no point during the discussion of Kol's statement did McLaurin's counsel argue that the coconspirator exception was inapplicable. However, even if the claim were not forfeited, it would have no merit.

Evidence Code section 1223 provides that evidence of an out-of-court statement offered against a party is admissible if: "(a) The statement was made by the declarant while participating in a conspiracy to commit a crime or civil wrong and in furtherance of the objective of that conspiracy; [¶] (b) The statement was made prior to or during the time that the party was participating in that conspiracy; and [¶] (c) The evidence is offered either after admission of evidence sufficient to sustain a finding of the facts specified in subdivisions (a) and (b) or, in the court's discretion as to the order of proof, subject to the admission of such evidence."

There must be "'independent evidence to establish prima facie the existence of . . . [a] conspiracy.' [Citations]." (*People v. Hardy* (1992) 2 Cal.4th 86, 139.) The remaining requirements of Evidence Code section 1223 are preliminary facts which must be proven by a preponderance of the evidence. (*Ibid*.; see *People v. Marshall* (1996) 13 Cal.4th 799, 832-833.)

26

Here, as McLaurin acknowledges, there was independent proof that a conspiracy existed and was ongoing at the time Kol made the statement at issue. McLaurin also does not dispute that there was evidence showing Kol's statement, if made, was made while Kol was participating in the conspiracy and in furtherance of it.

We discuss the evidence showing McLaurin's participation in the conspiracy in section 1 above. Even excluding Kol's statement, that evidence is sufficient to show that it is more likely than not that McLaurin agreed to participate in the conspiracy to rob Custom City.[12] Kol's statement was made on the drive to Custom City and so was made while McLaurin was participating in the conspiracy. Thus, the trial court did not err in admitting Kol's statement as an admission by a coconspirator.

McLaurin points out that when a statement is admitted pursuant to Evidence Code section 1223, the trial court is required to instruct the jury sua sponte on the use of that statement. (See *People v. Jeffery* (1995) 37 Cal.App.4th 209, 215.) The court chose to use CALCRIM No. 418 for this purpose. As given, the last requirement to be found by the jury read: "The statement was made before or during the time that the defendants were participating in the conspiracy."

McLaurin contends the trial court should have modified CALCRIM No. 418 "as described in the Bench Notes to insert appellant's name specifically into the last of the requirements to be found by the jury, i.e., '4. The statement was made before or during the time that Anthony McLaurin was participating in the conspiracy.'" The Bench Note suggests this modification in cases where out of court statements by a co-conspirator are offered against fewer than all of the defendants. Here, additional out of court statements by Kol and statements by coconspirators Moeum and Dontae were admitted, and appear

---

[12] McLaurin contends that at the time of Meas's testimony, very little evidence about his involvement had been introduced. There is no requirement that the facts of the conspiracy be proved before the statement is admitted. (Evid. Code, § 1223, subd. (c).) In any event, McLaurin is mistaken about the state of the evidence. Meas testified on February 27 about Kol's statement. McLaurin's and Jordan's cell phone records were introduced on February 19. Gyotoku testified on February 20 and testimony about McLaurin's visit to Custom City was also presented on that date. Testimony about the location of McLaurin's and Jordan's cell phones was given on February 26.

27

to be admissible against all three defendants. For example, on the way to Jordan's house on April 5th, Kol told Meas that they were going to "hit the lick" and get a large sum of money and marijuana. Thus, the trial court was correct in using the unmodified version of CALCRIM No. 418.

A specific instruction limited to Kol's statement about McLaurin would be, in effect, a pinpoint instruction. McLaurin's failure to request such an instruction forfeits his claim that the trial court erred in failing to give it. (*People v. Jennings* (2010) 50 Cal.4th 616, 675 [noting that a standard jury instruction can amount to a pinpoint instruction and finding forfeiture in defendant's failure to request the pinpoint instruction].)

Even if this claim were not waived, any error would be harmless. Kol's statement was made on the drive to Custom City. The same evidence that showed that McLaurin was a member of the conspiracy showed that he was participating in the conspiracy at the time Kol made the statement. Thus, there is no reasonable probability that McLaurin would have received a more favorable outcome if a pinpoint instruction had been given.

6. *Aranda-Bruton* violation

McLaurin contends the admission of Kol's statement about the "inside man" constituted a violation of the exclusionary rule set forth in *Bruton v. United States, supra,* 391 U.S. 123 and *People v. Aranda, supra,* 63 Cal.2d 518, and so also the confrontation clause.

Respondent contends that McLaurin has forfeited these claims by failing to raise them in the trial court. Respondent is mistaken. McLaurin's counsel specifically objected that admission of the statement "would be a violation of Mr. McLaurin's 5th [*sic*] Amendment right to confront either Mr. Jordan or Mr. Dana."[13] Since the *Aranda-Bruton* rule is based on the confrontation clause, it is preserved for review as well. However, neither claim has any merit.

---

[13] At the preliminary hearing, Meas had testified that Jordan and Kol had told him there would be an inside man. Ultimately, at trial, he attributed the statement only to Kol.

28

Both the United States Supreme Court and the California Supreme Court have held that the hearsay exception for coconspirator statements is firmly rooted in their jurisprudence and admission of a coconspirator's statement does not violate a defendant's right to confrontation. (*People v. Williams* (1997) 16 Cal.4th 635, 682.) Thus, "the *Aranda-Bruton* rule is inapplicable to statements made by coconspirators in furtherance of the conspiracy." (*People v. Sanders* (1995) 11 Cal.4th 475, 517, fn. 8.) Further, "*Aranda-Bruton* principles . . . apply in the case of a statement inculpating the defendant made by a nontestifying codefendant at a *joint* trial. [Citation.]" (*People v. Carter* (2003) 30 Cal.4th 1166, 1208-1209 [italics in original].) Kol was not tried jointly with McLaurin.

To the extent that McLaurin contends his counsel was ineffective for failing to request an instruction limiting the use of Kol's statement to Jordan and Lewis be given, we do not agree. As we discuss above, the statement was admissible against McLaurin. Thus, there was no basis for a limiting instruction and counsel was not ineffective for failing to request one.

7. Instruction about telephone calls

McLaurin contends that a key part of his defense was the argument that the prosecution could not prove that appellant was the person making the calls on his cell phone, and could not prove the contents of any conversations on that phone. He argues the trial court should have instructed the jury not to speculate about those two matters, and that its failure to do so violated his federal constitutional right to present a defense and to a trial by jury.

"Under appropriate circumstances, 'a trial court may be required to give a *requested* jury instruction that pinpoints a defense theory of the case by, among other things, relating the reasonable doubt standard of proof to particular elements of the crime charged. [Citations.] But a trial court need not give a pinpoint instruction if it is argumentative [citation], merely duplicates other instructions [citation], or is not supported by substantial evidence [citation].' [Citation.]" (*People v. Coffman and*

*Marlow, supra,* 34 Cal.4th at p. 99 [emphasis added].)

McLaurin did not request an instruction on speculation and so has forfeited his claim that such an instruction should have been given. (*People v. Jennings, supra,* 50 Cal.4th at p. 675.) McLaurin contends in the alternative that his counsel was ineffective in failing to request such an instruction.

McLaurin has the burden of proving ineffective assistance of counsel. (*People v. Pope* (1979) 23 Cal.3d 412, 425.) In order to establish such a claim, he must show that his counsel's performance fell below an objective standard of reasonableness, and that, but for counsel's error, a different result would have been reasonably probable. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688, 694; *People v. Ledesma* (1987) 43 Cal.3d 171, 216-218.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland v. Washington*, *supra*, 466 U.S. at p. 694.)

McLaurin only paraphrases the instruction he contends his trial counsel should have sought, making it difficult to evaluate his claim of ineffective assistance of counsel. He appears to be describing an instruction which would have told the jury that there was no evidence showing the identity of the caller and the purpose of the call, and the jury could not speculate on those issues.[14] Such an instruction would have foreclosed the jury from finding that McLaurin was the person using McLaurin's cell phone or that McLaurin's phone call with Jordan was related to the robbery. Such an instruction was not warranted by the state of the evidence.

There was sufficient circumstantial evidence to support a reasonable inference that McLaurin was the person placing the 7:35 p.m. call to Jordan's phone. It might be reasonable to infer from the bare fact of ownership of a cell phone, that the owner is the person who makes calls from that phone. However, we need not consider that scenario because there was more than mere evidence of McLaurin's ownership of the phone in this

---

[14] At one point, McLaurin argues "the trial court should have instructed the jury they could not speculate as to whether or not [McLaurin] was participating in the cell phone conversations . . . ."

30

case. Records show that three closely-spaced phone calls were placed from McLaurin's phone. McLaurin's phone called Johnny's phone at 7:19 p.m. About 15 minutes later, McLaurin's phone called Jordan's phone. That call ended at about 8:03 p.m. Six minutes later, at 8:09 p.m., McLaurin's phone called Johnny's phone. Johnny spoke with McLaurin during the 8:09 p.m. call.[15] It is reasonable to infer that the same person was using McLaurin's phone to place the three closely-spaced calls. Thus, it is reasonable to infer that McLaurin was the person placing the two earlier calls as well as the 8:09 p.m. call, particularly since one of those two calls was also to Johnny.

As we discuss in section 1 above, the circumstantial evidence was also sufficient to support a reasonable inference that the calls were related to the robbery and showed McLaurin's involvement in the robbery as a scout or look-out person.

Since a pinpoint instruction foreclosing the jury from making findings was not warranted by the state of the evidence, any request by trial counsel for such an instruction would have lacked merit. (See *People v. Coffman and Marlow, supra,* 34 Cal.4th at p. 99 [trial court need not give a pinpoint instruction which is not supported by substantial evidence].) Thus, counsel's performance did not fall below a reasonable standard, and appellant's claim fails. (See *People v. Assad* (2010) 189 Cal.App.4th 187, 198 [defendant's ineffective assistance of counsel claim rejected because pinpoint instruction was an impermissible comment on the evidence; therefore, defense counsel acted reasonably in not requesting instruction].)

To the extent that McLaurin is attempting to describe an instruction which would have applied the requirements for relying on circumstantial evidence to the particular issues of the phone calls, such an instruction would have been superfluous. The jury was adequately instructed on the definition of circumstantial evidence with CALCRIM No. 223 and the sufficiency of circumstantial evidence with CALCRIM No. 224. CALCRIM No. 224 specifically told the jury that the People had to prove each fact essential to a conclusion beyond a reasonable doubt, and that the jury "must accept only reasonable

---

[15]   Johnny apparently did not answer the 7:19 p.m. phone call.

conclusions and reject any that are unreasonable." Thus there is no reasonable probability that McLaurin would have received a more favorable outcome if a pinpoint version of the circumstantial evidence instructions had been requested and approved. McLaurin's ineffective assistance of counsel claim fails for this reason as well.

8. *Griffin* error

Lewis contends that the prosecutor impermissibly commented on his failure to testify on his own behalf, in violation of *Griffin v. California, supra,* 380 U.S. 609. McLaurin contends that as a nontestifying codefendant, he too was prejudiced by the prosecutor's comments about Lewis's failure to testify.

A prosecutor may not comment on a defendant's failure to testify on his or her own behalf. (*Griffin v. California, supra*, 380 U.S. at p. 615.) "Pursuant to *Griffin*, it is error for a prosecutor to state that certain evidence is uncontradicted or unrefuted when that evidence could not be contradicted or refuted by anyone other than the defendant testifying on his or her own behalf. [Citations.]" (*People v. Hughes* (2002) 27 Cal.4th 287, 371-372.) It is also "error for the prosecution to refer to the absence of evidence that only the defendant's testimony could provide. [Citation.]" (*Id*. at p. 372.)

A prosecutor may comment on the state of the evidence or on the failure of the defense to introduce material evidence or call logical witnesses. (*People v. Hughes, supra*, 27 Cal.4th at p. 372.) This includes "comment on the defense's failure at trial to introduce evidence that could reasonably have been expected [citation]—save only, of course, the testimony of the defendant himself." (*People v. Clair* (1992) 2 Cal.4th 629, 662.) Any challenged comments must be viewed in the context of the argument as a whole. (*People v. Cole* (2004) 33 Cal.4th 1158, 1203.)

The prosecutor first argued: "Lewis, he has an excuse for everything. The eyewitnesss [*sic*] are wrong. The G.S.R. could have been transferred. Deputy Yzabal is wrong because Deputy Tovar says he was there." The prosecutor soon continued: "But what Lewis doesn't explain to you is three things[.]" In context, the reference to Lewis is clearly to Lewis's counsel's statements during closing argument.

The first "thing" that is not explained is Gyotoku's testimony, which is "never

32

addressed" and "never explained." This comment is most reasonably understood as pointing out, correctly, that Lewis's counsel never referred to the testimony at all. Counsel could have attacked this testimony in a number of ways that did not require Lewis's testimony. For example, he could have attacked Gyotoku's credibility in light of her testimony that her relationship with Jordan was breaking down at that time or argued that her testimony put Lewis in the backyard several hours before the robbery and so had no probative value.

The second "thing" that was not explained was "why [Lewis] was in somebody's backyard." This comment is most reasonably understood as a response to Lewis's counsel's argument that Deputy Yzabal was mistaken about seeing Lewis get out of the van. The prosecutor argued that even assuming that Deputy Yzabal was mistaken about Lewis getting out of the van, the evidence showed that Deputy Yzabal arrested Lewis very near the scene of the crime at very close to the time of the crime, in an unknown person's backyard. Lewis's counsel did not even mention this evidence. Counsel could have addressed this issue in a number of ways that did not require Lewis's testimony. For example, counsel could have argued that many people lived in the area of the crime scene, and mere presence near the scene of the crime was not incriminating without a link to the crime, such as an earlier presence in the van.

The third "thing" that was not explained was why there was a blood stain on Lewis's pants that the prosecutor believed matched Richardson. In fact, Lewis's counsel had addressed the stain, arguing, "[T]he prosecution in their closing and first statement that you just heard spoke about a victim's blood, Mark Richardson's blood being on Mr. Lewis's sweat pants. . . . It's not true. No one ever said that. They can't prove that." Given counsel's position that the blood was not Richardson's, there was nothing else for counsel to explain.

Thus, the prosecutor's arguments were all addressed to the failure (or apparent failure) of Lewis's counsel to even mention some of the incriminating evidence against Lewis. Counsel may have chosen not to mention this evidence for tactical reasons, but the evidence could have been contradicted or refuted by other means than Lewis

33

testifying on his own behalf.  There was no *Griffin* error.

Assuming for the sake of argument that a nontestifying codefendant could be prejudiced by "bleed over" from *Griffin* error, there was no *Griffin* error here and so no prejudice to McLaurin, or to Jordan.

9.  Suppression of evidence

Jordan contends the prosecution violated its obligations under *Brady v. Maryland, supra,* 373 U.S. 83 and state discovery statutes by failing to disclose an August 30, 2012 letter from the prosecution to Meas detailing a plea offer.  He further contends this failure amounted to prosecutorial misconduct.  Jordan also contends the trial court erred prejudicially in denying appellants' motion to exclude Meas's testimony as a sanction for those violations.  McLaurin and Lewis join these contentions.

a.  Applicable law

The prosecution must disclose evidence it intends to use for trial as well as any exculpatory evidence at least 30 days before trial.  (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1133.)

Under *Brady v. Maryland, supra*, 373 U.S. 83, "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  (*Id.* at p. 87.)  Evidence is "material" if there is a reasonable probability that if the evidence had been disclosed to the defense, the result would have been different.  (*People v. Dickey* (2005) 35 Cal.4th 884, 907.)  "Evidence is 'favorable' if it either helps the defendant or hurts the prosecution, as by impeaching one of its witnesses. [Citation.]"  (*In re Sassounian* (1995) 9 Cal.4th 535, 544.)  Impeachment evidence is not material if it adds "little to the cumulative impact of the other impeachment evidence."  (*People v. Dickey, supra,* 35 Cal.4th at p. 908.)

"'[E]vidence that is presented at trial is not considered suppressed, regardless of whether or not it had previously been disclosed during discovery.'"  (*People v. Verdugo* (2010) 50 Cal.4th 263, 281.)

34

b. Facts

On February 7, 2013, during voir dire, defense counsel brought to the court's attention the existence of at least one letter concerning a plea offer to Meas if he testified for the prosecution. The court reviewed a letter dated March 22, 2012 and ordered it disclosed to the defense. This letter sought a statement from Meas to review for a possible plea agreement, and offered immunity for the statement. The prosecutor did not provide any other letter to the court for its review.

On February 13, 2013, the second day of trial, Lewis's counsel informed the court that he had come into possession of a second letter, dated August 30, 2012, from the prosecutor to Meas, detailing a plea offer. The defense pointed out that they had "been requesting a copy of any agreement between the district attorney's office and Mr. Meas for months" but had received nothing. The August letter stated that Meas would receive a sentence of 20 years in prison if he testified truthfully for the prosecution in this case. The prosecutor had never turned over this letter to the defense or disclosed its contents to them.

The court held a hearing on the August letter the next day. The prosecutor represented that Judge Hunter, who presided over Meas's trial, had said that she would not vacate Meas's sentence in order for the plea agreement to go into effect. Thus, there was no plea agreement. The prosecutor also represented that she "had no intention of ever going back to [Judge Hunter] on this issue at least on my own [motion]." The prosecutor did not "intend to ever talk to her about it." In addition, the prosecutor represented that the letter had been sealed by Judge Hunter, at the request of Meas's counsel because he did not want a "snitch jacket." The prosecutor may have joined in the motion.

The trial court noted that if the August letter were sealed, the court would not expect the prosecutor to mention it at all. Lewis's counsel pointed out that the prosecutor could have told the court about the letter's existence in chambers, and a good time would have been when she met with the court about the March letter.

The court ruled as follows: "With respect to the arguments on the motion itself, I

35

agree with some things defense counsel have said. There are other things I disagree with. One of the things I . . . do agree with is that this letter . . . should not have been brought up to the court in the way that it was. That being said, I'm going to deny the motions, and we'll proceed from there."

Meas began testifying on February 27, about two weeks after the hearing on the letter. Appellants' counsel were permitted to use the August letter in their cross-examination of Meas.

### c. Violations

Since the August letter was used at trial, the letter was not "suppressed" within the meaning of *Brady v. Maryland, supra,* 373 U.S. 83. (*People v. Verdugo, supra*, 50 Cal.4th at p. 281.) There was no *Brady* violation.

There appears to have been a violation of state law discovery requirements. Although one or both of the letters were sealed, the purpose of the sealing was to protect Meas while in prison. The prosecutor should have at least informed the trial court in camera of the August letter's existence in a timely manner, so that it could determine the appropriate way to handle the letter. Clearly, if Meas actually testified, sealing the letter would no longer be necessary or appropriate. Jordan argued that the prosecutor's violation of the discovery statute was intentional, and constituted misconduct. We will assume the failure to disclose the letters to the court constituted prosecutorial misconduct.

### d. Sanctions

We see no abuse of discretion in the trial court's decision not to impose sanctions precluding Meas from testifying.

The trial court may make any order necessary to enforce the provisions of the discovery statute, including "delaying or prohibiting the testimony of a witness." (§ 1054.5, subd. (b).) However, the court may prohibit the testimony of a witness "only if all other sanctions have been exhausted." (§ 1054.5, subd. (c).)

Appellants argue the sanctions were necessary because the late discovery of the

36

letter precluded them from questioning Meas about the letter at the preliminary hearing. As a result, they "lacked foresight as to how Meas would respond when finally asked about the letter at trial."

Meas was questioned at the preliminary hearing about his attempts to obtain a reduced sentence in exchange for testifying. He acknowledged that he had made the attempts, stated that he did not obtain a deal and explained that he was testifying anyway to clear his conscience. This testimony should have given appellants' counsel reasonable insight into how Meas would testify about the August letter. It should have been no surprise when Meas testified that he no longer cared about the deal and was testifying to give the victims' families closure.

Appellants also contend that sanctions were appropriate because the failure to timely disclose the August letter meant they were unable "to fully cross-examine on it; the trial court kept sustaining objections to references to it as an agreement although both parties signed their copies. The trial court also precluded the defense from asking about Meas later requesting a reduced sentence and if the letter could help him." We see no connection between late disclosure of the letter and the trial court's rulings sustaining objections to questions about the letter. To the extent that appellants contend that if they had received the letter earlier and had time to investigate the circumstances of the letter, they could have shown that the letter was a valid agreement or that Meas did in fact intend to request a reduced sentence, that claim would depend on matters outside the trial record and would have to be raised in a petition for writ of habeas corpus.

Since appellants have not shown prejudice from the late disclosure of the letter, their claim of prosecutorial misconduct fails on appeal. (See *People v. Barnett* (1998) 17 Cal.4th 1044, 1133 [even when prosecutor commits misconduct, reversal is required only if it is reasonably probable that a result more favorable to the defendant would have occurred in the absence of the misconduct].)

10. DNA evidence

Jordan contends the trial court erred in excluding evidence that testing by his DNA

37

expert, Thomas Fedor of SERI labs, showed that "the major portion" of the DNA mixture recovered from the interior collar of the black leather jacket found under the vehicle was from an unknown female. He further contends that the prosecutor committed misconduct during closing argument by highlighting the evidence she argued successfully to exclude. We disagree.

    a. Exclusion of evidence

"Third party culpability evidence is admissible if it is 'capable of raising a reasonable doubt of defendant's guilt. At the same time, we do not require that any evidence, however remote, must be admitted to show a third party's possible culpability. . . . [E]vidence of mere motive or opportunity to commit the crime in another person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt; there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime.' [Citations.]" (*People v. Page* (2008) 44 Cal.4th 1, 38.)

Here, the jacket itself did provide a link to the crimes, since a watch stolen from a victim at Custom City was found in the jacket's pocket. However, there was nothing to suggest that an unknown woman had been wearing the jacket around the time of the Custom City crimes. No victim or witness stated that one of the robbers was a woman. No woman was seen near the car where the jacket was recovered shortly after the crimes. Although a female shoe was found in the Custom City parking lot and its apparent mate found in Meas's van, Meas never mentioned a female being involved in the crimes and there was no reason for him to lie about this.[16] Although a female was the major contributor to the DNA mixture analyzed by SERI, that does not show that a woman was the last person to wear it or the person who wore it most frequently. Thus, the female

---

[16]    Further, there is no indication in the record that the shoes were tested for DNA, and so nothing to suggest that the female who wore the shoes was the female whose DNA was on the jacket. We note that Jordan points out female DNA was found on one of the guns used in the crimes. Nothing in the record suggests that the firearm DNA matched the jacket DNA.

DNA does not link a female to the crime. The trial court did not err in excluding the evidence.

Further, even if the trial court erred, any error was harmless under a state or federal standard of review. The prosecution's expert's DNA analysis had shown that there was a mixture of DNA on the collar with the major contributor being Paul Jordan. The SERI analysis picked up a different DNA mixture, either from an area that had previously been swabbed or from a different part of the collar than the previous sample. For this mixture, a female was the major contributor.[17] Thus, the SERI results simply showed that at some point, an unknown female had contributed DNA to the jacket in addition to the several unknown males shown by the prosecutor's expert. Further, the SERI results showed that Jordan had a 1 in 4600 chance of being a minor contributor to the mixture it tested, reinforcing Jordan's connection to the jacket.

In addition, there was other evidence linking Jordan to the jacket. The jacket at issue was recovered from underneath a car that Jordan tried to hide under when being chased by police, thus putting him in close proximity to the jacket very shortly after the crimes. Jordan was known to own a black leather jacket. There was no such additional evidence linking a female to the jacket. There is no reasonable probability or possibility that the SERI results would have raised a reasonable doubt in the jury's mind about Jordan's guilt and resulted in a more favorable outcome for Jordan.

b. Prosecutorial misconduct

Jordan contends the prosecutor committed misconduct during her rebuttal argument by highlighting the absence of DNA evidence she successfully argued should be excluded. Specifically, Jordan contends that by arguing that the jacket had Jordan's DNA on it and did not have Denkins's DNA, the prosecutor gave the false "impression . . . the jacket did not have anyone else's DNA on it."

Respondent contends that Jordan has forfeited this claim by failing to object and

---

[17] The representative from SERI did not claim that the prosecutor's expert made a mistake in her analysis.

request an admonition. (*People v. Samayoa* (1997) 15 Cal.4th 795, 841.) We agree. Jordan contends that if his claim is forfeited, he received ineffective assistance of counsel.

Jordan has the burden of proving ineffective assistance of counsel. (*People v. Pope, supra,* 23 Cal.3d at p. 425.) In order to establish such a claim, he must show that his counsel's performance fell below an objective standard of reasonableness, and that, but for counsel's error, a different result would have been reasonably probable. (*Strickland v. Washington, supra,* 466 U.S. at pp. 687-688, 694; *People v. Ledesma, supra,* 43 Cal.3d at pp. 216-218.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland v. Washington*, *supra*, 466 U.S. at p. 694.)

In response to Jordan's counsel's argument that Denkins might have been the source of the black jacket found by police, the prosecutor argued, "So we're supposed to believe that Mr. Denkins, instead of going another way, of course, runs into the police dragnet, because that's his jacket or he was wearing that jacket. Which, of course, didn't have any of his DNA on it, but did have Paul Jordan's. And I think the number was like 1 in some 25 quintillion or something."

This argument is not reasonably understood as implying that only Jordan's DNA was on the jacket. The clear point of the argument is that Denkins' DNA was not on the jacket. As we discuss, above, the DNA evidence which the prosecutor sought to exclude related to a female contributor. The prosecutor argued the evidence was not relevant because there was no evidence that a female was involved in the crime.[18]

---

[18] We note that SERI's test results showed there were a number of minor contributors to the DNA on the jacket. There was not a lot of discussion about those contributors. At one point, the prosecutor argued that if appellants could introduce evidence of the female DNA, she should be able to inquire about the minor contributors. Ultimately, the court excluded evidence from SERI about the minor contributors because the percentages of inclusion were so large. The origins of the ruling appear to lie in a pretrial motion by Lewis to exclude DNA results offered by any party which included a large percentage of the population, on the ground that the numbers were not relevant or probative. Jordan joined the motion. Assuming Denkins was included as a possible

Jordan's counsel's performance was  reasonable.  "[A] defense counsel is not required to advance unmeritorious arguments on [a] defendant's behalf."  (*People v. McPeters* (1992) 2 Cal.4th 1148, 1173; see also *People v. Grant* (1988) 45 Cal.3d 829, 864-865 [to prevail on ineffectiveness claim based on counsel's failure to make a motion, defendant must show that such motion would have been successful].)

11. Jordan's prior conviction

Jordan contends the trial court abused its discretion in permitting the prosecution to impeach him with his 1991 conviction for robbery because the prejudicial impact of the conviction outweighed any impeachment value.  We see no abuse of discretion.

A witness may be impeached with any prior felony conviction which involves moral turpitude.  (*People v. Castro* (1985) 38 Cal.3d 301, 313-316.)  However, pursuant to Evidence Code section 352, a court may exclude evidence that attacks the credibility of a witness if the prejudicial impact outweighs the probative value.[19]  (*People v. Castro, supra,* 38 Cal.3d at pp. 312-313; *People v. Clark* (2011) 52 Cal.4th 856, 931.)  Factors considered in an Evidence Code section 352 analysis include whether the conduct bears adversely on the person's honesty or integrity and the nearness or remoteness of the prior conduct.  (*People v. Collins* (1986) 42 Cal.3d 378, 391.)  A trial court's decision under Evidence Code section 352 is reviewed for an abuse of discretion.  (*People v. Clark, supra*, 52 Cal.4th 856, 932.)

Jordan contends that because his conviction was suffered in 1991, it was too remote to be probative, and because it was for robbery, it was of "lesser value in assessing a witness' credibility."  At the same time, it was highly prejudicial because it

---

minor contributor in the SERI results, any exclusion of that evidence was the result of Lewis's motion, not the prosecution's efforts.

[19]    Evidence Code section 352 provides:  "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

41

was for the same offense with which he was charged in this case. We do not agree.

Generally, older convictions are admissible for impeachment if the witness has not led a blameless life since the conviction. (*People v. Green* (1995) 34 Cal.App.4th 165, 183 [20-year-old conviction admissible when defendant suffered five additional convictions in that 20-year period].) Here, as the trial court noted, Jordan's 1991 conviction was not an isolated incident. He received a seven-year prison sentence. He violated his parole in that matter at least once, and was still on parole at the time of his conviction in 2000 for possession for sale of a controlled substance in violation of Health and Safety Code section 11351.5. (*People v. Jordan* (2003) 108 Cal.App.4th 349.) He received a 10-year prison sentence for that conviction. Thus, he had not led a blameless life since 1991.

Robbery is a crime of moral turpitude which "involves intentional dishonesty for the purpose of personal gain." (*People v. Brown* (1985) 169 Cal.App.3d 800, 806 citing *In re Hallinan* (1954) 43 Cal.2d 243.) Jordan's other conviction, possession for sale of a controlled substance, also shows moral turpitude, but "the trait involved is not dishonesty but, rather, the intent to corrupt others." (*People v. Castro* (1985) 38 Cal.3d 301, 317.) Since robbery involves dishonesty, it could reasonably be viewed as more probative of credibility than appellant's other conviction, possession for sale of a controlled substance, which does not involve dishonesty.

Jordan's robbery conviction was probative of his credibility, and was arguably more probative on the issue of dishonesty than his conviction for possession for sale. Jordan had not led a blameless life since the robbery conviction. There was some prejudicial potential from the fact that Jordan was charged in the present case with robbery. We cannot say that the trial court acted arbitrarily or exceeded the bounds of reason in impliedly finding that the probative value of the conviction outweighed its prejudicial potential.

12. Section 667, subdivision (a) enhancements

Jordan contends the abstract of judgment must be corrected to show that the trial

42

court imposed section 667, subdivision (a) enhancement terms on counts 1, 2, and 3 only. The abstract shows the enhancement was imposed on every count except count 11, on which sentencing is stayed. Jordan is correct that the abstract of judgment does not match the court's oral pronouncement of sentence. However, the abstract of judgment must stand.[20]

As Jordan implicitly acknowledges, section 667, subdivision (a), enhancements are mandatory. (§ 1385, subd. (b).) Thus, if the enhancement may be imposed, it must be imposed. Jordan does not challenge the imposition of a section 667 enhancement on each of the first three counts, which involve indeterminate terms which were doubled pursuant to the Three Strikes law. (See *People v. Misa* (2006) 140 Cal.App.4th 837, 845-846.) It is the imposition of separate enhancements on the determinate terms which he challenges.[21]

Jordan points out that for multiple determinate sentences pursuant to section 1170.1, only one section 667, subdivision (a), enhancement may be imposed, to increase the aggregate total of multiple determinate sentences. (*People v. Tassell* (1984) 36 Cal.3d 77, 89-92, overruled on other grounds by *People v. Ewoldt* (1994) 7 Cal.4th 380.) As the court in *Tassell* explained, "Section 1170.1 refers to two kinds of enhancements: (1) those which go to the nature of the offender; and (2) those which go to the nature of the offense. Enhancements for prior convictions—authorized by sections 667.5, 667.6, and 12022.1—are of the first sort. The second kind of enhancements—those which arise

---

[20]    The issue of whether a trial court must impose a section 667, subdivision (a) enhancement on each determinate term imposed under the Three Strikes law is currently before the California Supreme Court in *People v. Sasser* (2014) 223 Cal.App.4th 1148, review granted May 14, 2014, S217128.

[21]    Under *Misa*, which Jordan appears to accept as correctly decided, the trial court would be required to impose at least one additional section 667, subdivision (a) enhancement to the aggregate of the determinate terms. (See *People v. Misa, supra*, 140 Cal.App.4th at pp. 845-846 [imposing a section 667, subdivision (a) enhancement on an indeterminate term which was doubled pursuant under the second strike provisions of the Three Strikes law and a section 667, subdivision (a) enhancement to a determinate term which was similarly doubled].)

from the circumstances of the crime—are typified by sections 12022.5 and 12022.7: was a firearm used or was great bodily injury inflicted? Enhancements of the second kind enhance the several counts; those of the first kind, by contrast, have nothing to do with particular counts but, since they are related to the offender, are added only once as a step in arriving at the aggregate sentence." (*Id*. at p. 90.) However, Jordan was not sentenced pursuant to section 1170.1.

Jordan was sentenced pursuant to the Three Strikes law, albeit as a second strike defendant. As the court in *People v. Williams* (2004) 34 Cal.4th 397 explained, "The Three Strikes law, unlike section 1170.1, does not draw any distinction between status enhancements, based on the defendant's record, and enhancements based on the circumstances of the current offenses, and the Three Strikes law generally discloses an intent to use the fact of recidivism to separately increase the sentence imposed for each new offense." (*Id*. at pp. 404-405.) Under the Three Strikes law, "the status or nature of the offender as a person previously convicted of serious felony offenses does not result merely in a single additional term of imprisonment for each prior conviction added on to the overall sentence that would otherwise be imposed for all of the new offenses. Instead, the Three Strikes law uses a defendant's status as a recidivist to *separately* increase the punishment for *each* new felony conviction. For a defendant with a single qualifying prior conviction, the sentence for each new offense is double what it otherwise would be. [Citations.]" (*Id*. at p. 404, fn. omitted.)

In *People v. Williams, supra*, 34 Cal.4th 397, the court was considering an indeterminate sentence imposed on a defendant who had two or more prior strike convictions, and so the case is not controlling in the present case, at least as to the second strike determinate terms. We agree with respondent that the logic of *Williams* requires the section 667, subdivision (a) enhancements to be imposed on all counts which are sentenced under the Three Strikes law. (See *People v. Misa, supra*, 140 Cal.App.4th at p.847 [noting that the analysis in *Williams* indicated that second strike defendant should also have a section 667, subdivision (a) enhancement added to a determinate term in addition to any such enhancement imposed on indeterminate terms].) Accordingly, the

44

trial court did not err in imposing separate section 667, subdivision (a), enhancements on all counts.

13. Section 12022 enhancements

Jordan contends the abstract of judgment must be corrected to show that firearm enhancements imposed on counts 5 through 9 were imposed pursuant to section 12022, subdivision (a)(1), rather than section 12021. Jordan further contends that the abstract must be corrected to show that the trial court stayed the section 12022 enhancement on count 2. Jordan is correct, and the abstract is ordered corrected.

14. Custody credit

McLaurin was awarded 601 days of presentence custody credit. He contends he is entitled to 1 additional day, for a total of 602 days. Respondent agrees. We agree as well.

McLaurin is entitled to credit for his actual days in custody, including the day of his arrest and the day of his sentencing. (*People v. Browning* (1991) 233 Cal.App.3d 1410, 1412.) He was arrested on November 30, 2011 and was sentenced on July 23, 2013. Thus, the total number of days in custody was 602 days.

15. Cumulative error

McLaurin contends that even if the errors in his case were not prejudicial when considered individually, the cumulative effect of the errors was prejudicial. The few errors in this case were minor, and are not prejudicial when considered cumulatively.

Disposition

The abstract of judgment for Jordan is ordered corrected to show that the firearm enhancement for counts 5 through 9 were imposed pursuant to section 12022, subdivision (a)(1), rather than section 12021, and also to show that the trial court stayed the section 12022 enhancement on count 2. The abstract of judgment for McLaurin is ordered

45

corrected to show that he has 602 days of presentence custody credit. The clerk of the superior court is instructed to prepare amended abstracts of judgment reflecting these corrections, and to deliver copies of the amended abstracts to the Department of Corrections and Rehabilitation. The judgment is affirmed in all other respects.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

GOODMAN, J.*

We concur:

TURNER, P.J.

MOSK, J.

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.